UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                               Crim. No. 2:13-cr-14-wks-3

James Nastri

## REPORT AND RECOMMENDATION
## AND ORDER
(Doc. 441)

James Nastri, proceeding *pro se*, moves under 28 U.S.C. § 2255 to vacate the

judgment imposed on him in this district in 2015. (Doc. 441.) He also requests an

evidentiary hearing and court-appointed counsel. (*Id.* at 17.) Following a six-day trial

where he was represented by counsel, Nastri was convicted of conspiring to distribute

100 grams or more of heroin, a violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). (Doc. 400

at 1.) He was sentenced to 210 months' imprisonment, to be followed by an eight-year

term of supervised release. (*Id.* at 2.) Nastri appealed, with new counsel representing

him. The Second Circuit affirmed the conviction and sentence; and the Supreme Court

subsequently declined to issue a writ of certiorari. *United States v. Nastri*, 647 F. App'x

51 (2d Cir.) (Summary Order), *cert. denied*, 137 S. Ct. 232 (2016); (*see also* Doc. 431).

In his § 2255 Motion, which is accompanied by a supporting Affidavit, (Doc.

441-1), Nastri raises six ineffective assistance of counsel (IAC) claims, which he argues

entitle him to *vacatur* of his conviction and renewed plea negotiations, as well as the

opportunity either to accept his previously rejected plea offer, or to receive a new trial.

(Doc. 441 at 17.) Nastri's IAC claims relate to Attorney Edgar Fankbonner's

representation of Nastri in the trial court, (*id.* at 3–11, 14–16), Attorney Jesse Siegel's representation of Nastri on appeal, (*id.* at 11–13, 15–16), and "[t]he cumulative [e]ffect of counsel[]s['] errors." (*Id.* at 16.)

In response to Nastri's Motion, the government sought and received an order compelling an affidavit from Nastri's trial counsel, Attorney Fankbonner. (Docs. 443, 444.) Relying in part on Fankbonner's Affidavit and Supplemental Affirmation, (Docs. 445, 446), the government argues in its Memorandum in Opposition that Nastri's claims are meritless and the Court should thus deny his § 2255 Motion. (Doc. 447.) Nastri filed a Reply in response to the government's Opposition, wherein he renewed the arguments stated in his § 2255 Motion, including his request for appointed counsel. (Doc. 450.)

For the reasons stated below, I conclude that Nastri has failed to establish that the performance of either his trial or appellate counsel was objectively deficient, or that Nastri suffered prejudice from any allegedly deficient performance. I therefore recommend that Nastri's § 2255 Motion (Doc. 441) and request for an evidentiary hearing be DENIED. Nastri's request to appoint counsel (*id.* at 17) is DENIED.

## Factual and Procedural Background

The following facts are derived from the records of this Court, including the Presentence Report; the transcripts of the pretrial conference, the trial, and the sentencing hearing, (Docs. 412–417, 419); and the Opinion from the Second Circuit Court of Appeals' April 2016 Opinion affirming Nastri's conviction. *United States v. Nastri*, 647 F. App'x 51 (April 26, 2016); (*see also* Doc. 431).

# I. Preliminary Proceedings

An April 25, 2013 indictment charged Nastri and others with conspiring to distribute 100 grams or more of heroin from the Spring of 2011 through April 10, 2013, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B). (Doc. 47 at 1–2.) Attorney Robert Sussman was appointed under the Criminal Justice Act (CJA), 18 U.S.C. § 3006A, to represent Nastri. (Doc. 108.) On June 12, 2013, Nastri was arraigned and pled not guilty, and the Court ordered him detained. (Doc. 111.)

In December 2013, Attorney Sussman filed a motion to suppress statements and tangible evidence seized from Nastri during a March 14, 2012 traffic stop. (Doc. 221.) Nastri waived a hearing on the motion, (Doc. 261), and on April 8, 2014, the Court denied the motion in a written Opinion and Order. (Doc. 285 at 1–2.) On March 20, 2014, the Court issued an order scheduling Nastri's jury draw for April 17, and setting April 28 as the date for commencement of testimony. (Doc. 262.) On April 1, 2014, the government filed a notice of prior conviction under 21 U.S.C. § 851, (Doc. 280), which had the effect of doubling Nastri's mandatory minimum term of imprisonment from five years to ten.

On April 8, 2014, Attorney Sussman moved to withdraw as counsel for Nastri, (Doc. 284), and Nastri retained Attorney Fankbonner to represent him at trial. (Doc. 445 at 1, ¶ 1.) A day later, Fankbonner entered his appearance as counsel for Nastri, (Doc. 289), and moved to continue the jury draw and trial date. (Doc. 290.) The Court reset jury selection for May 6, 2014, and the start of testimony for May 27. (Doc. 299.)

On April 11, 2014, the government wrote to Attorney Fankbonner, enclosing "a copy of all discovery and trial correspondence sent to prior counsel, as well as some additional discovery." (Doc. 447-1 at 1.) The government sent additional discovery on a weekly basis throughout April and May until trial. (*Id.* at 3–13.) In an April 18 letter, the government stated that it reserved the option to introduce any recorded jail telephone call that had been produced to the defense and that it "specifically plan[ned]" to introduce certain calls that it identified by file name. (*Id.* at 4.)

On April 24, 2014, the government conveyed two plea offers for Nastri to Attorney Fankbonner via email. (Doc. 445 at 1, ¶ 6.) Both plea offers required Nastri to plead guilty to violating 21 U.S.C. §§ 846 and 841(b)(1)(B),[1] which carried a mandatory minimum of five years' imprisonment, and one of the plea offers would have required Nastri to testify in a murder trial in Maine. (*Id.*)

Attorney Fankbonner states that he and Nastri reviewed the entirety of the discovery material in Fankbonner's possession. (*Id.* at 2, ¶ 8.) Fankbonner explained that he expected the government to call numerous co-conspirators to testify, and that there would be other evidence beyond co-conspirator testimony, including "photographs of Mr. Nastri and his co-conspirators . . . , photographs of the narcotics and cash recovered from him and his co-conspirators, call logs, text messages, and other material culled from the conspirators' cell-phones, and other evidence of the organization's activities throughout New England." (*Id.* ¶ 11.) Fankbonner explained the

---

[1] It is assumed that the reference in Attorney Fankbonner's affidavit to a plea offer, which contemplated a plea to a Title 8 offense, is in error given the nature of the Title 21 charges brought against Nastri.

government's plea offers to Nastri, advising him of "the pros and cons of each." (*Id.* ¶ 12.) Fankbonner told Nastri that he thought it possible for him to prevail at trial but that he should consider taking a plea to reduce his risk of a sentence of more than ten years' imprisonment. (*Id.* ¶ 13.) He "expressly told" Nastri that the decision was "highly personal" and "depended in part on [Nastri's] tolerance for risk." (*Id.* ¶ 14.) Attorney Fankbonner states that Nastri responded that he did not wish to accept either plea offer and wanted to go to trial. (*Id.* ¶ 15.)

On April 28, 2014, the Court held a pre-trial conference. The conference began at 9:30 a.m. but was postponed to 3:45 p.m. to allow the parties time to conduct further negotiations regarding a possible plea. (Doc. 417 at 2–8.) When the conference reconvened in open court, Attorney Fankbonner, in the presence of Nastri, explained that while the plea offers were substantially similar to a previous offer, the sentence the government would recommend was lower. (*Id.* at 9.) During the break, Fankbonner negotiated further with the government and secured an even lower recommended sentence. (*Id.*) He and Nastri "went over the offer several times in detail"; however, Nastri was not prepared to take the offer. (*Id.* at 8.) The government agreed to leave the offer open until the next morning so that Nastri could speak with his family about the offer. (Doc. 17.) During the hearing, the Court directly addressed Nastri, confirming that he understood the plea offers. (*Id.* at 6–7, 13–14.) Ultimately, Nastri declined to plead guilty, informing Fankbonner that he would not enter a plea agreement that called for him to testify at trial against other defendants for fear that he would be marked as an informant in prison, and that he "wished to take his chances at

trial" because if he was acquitted, he would be able to see his father before he died. (Doc. 446 at 1–2, ¶¶ 10, 12; *see* Doc. 445 at 2, ¶ 15.)

In early May, Attorney Fankbonner received additional discovery material, including recordings of calls made by Nastri from jail to his co-conspirators after his arrest, as well as cell-tower data, photos, and other electronic evidence from coconspirators' phones. (Doc. 445 at 3, ¶ 20.) On May 6, Fankbonner sent a copy of the discovery material to Nastri at the Northwest State Correctional Facility in Swanton, Vermont. (Doc. 445 at 3, ¶¶ 19, 21; Doc. 446 at 1, ¶ 4.) At some later date, however, the package was returned to Fankbonner's office unopened. (Doc. 446 at 1, ¶ 4.) On May 19, Fankbonner resent the discovery material to Nastri at the Essex County Jail in Lewis, New York. (Doc. 445 at 3, ¶¶ 22, 23.) Fankbonner now states: "My file and my case notes are silent as to what specific materials I sent to Mr. Nastri on May 19, 2014, but it is probable that it contained CDs because by that time Mr. Nastri had been moved to Essex, where (I believe) he would have been granted computer access[.]" (Doc. 446 at 2, ¶ 8.) The record confirms Fankbonner's belief. Specifically, on May 5, 2014, Fankbonner filed a motion requesting that Nastri be relocated to a facility that provided computer access so that Nastri could access the electronic evidence furnished in discovery. (Doc. 317 at 1–2.) But the motion was denied as moot after the United States Marshal's Office informed the Court that Nastri had already been relocated to a facility that permitted him access to electronic evidence. (Doc. 319.)

## II.    Trial

Nastri's trial began on May 27, 2014, and the government completed its case on May 30.  (*See* Docs. 412–416; Doc. 416 at 253.)  During the trial, the government sought to establish that Nastri participated in a large multi-member conspiracy to distribute heroin in Vermont from 2011 until 2013.  (*See* Doc. 412 at 33–53.)  To establish the conspiracy, the government presented the testimony of several investigators, who described seizing drugs, firearms, cellphones, vehicles, and other evidence of drug trafficking and connecting this evidence with Nastri and the other members of the conspiracy.  (*See* Doc. 412 at 76–79, 97–113; Doc. 413 at 12–78; Doc. 415 at 15–36, 192–205.)  Law enforcement witnesses also testified that confidential informants executed several controlled buys from the conspirators, which typically involved a confidential informant purchasing heroin, crack cocaine, or cocaine from the conspirators with currency for which the serial numbers had been recorded.  (*See* Doc. 414 at 162–73; *id.* at 246–63.)  To further establish Nastri's role in the conspiracy, the government presented the testimony of several conspirators who had previously pled guilty and who were cooperating with the government, including Raven Peres and Nastri's former girlfriends and coconspirators, Laura Urban and Nicole Rivers.  (*See* Doc. 412 at 113–201; Doc. 413 at 96–236; Doc. 415 at 58–177.)  The content of this testimony was corroborated by cellular telephone records, including location monitoring records and transcripts of text messages sent by the conspirators, (Doc. 412 at 263–82; Doc. 413 at 5–78; Doc. 415 at 6–15), recordings of Nastri's prison telephone calls in which Nastri made damaging admissions, (Doc. 412 at 64–71; Doc. 414 at 37, 161–62,

264; Doc. 415 at 251–52), and letters from Nastri to Urban. (Doc. 415 at 124–34.) Finally, the government presented evidence from a March 14, 2012 stop and search of Nastri's person and vehicle, which included $17,763 in cash, a small quantity of marijuana, drug paraphernalia, and a black ledger book that appeared to reflect drug transactions. (*See* Doc. 413 at 230–34; Doc. 415 at 228–51.) The confiscated currency included a $20 bill that matched currency from a controlled buy on March 8, 2012. (Doc. 415 at 219.)

After the government rested its direct case, Attorney Fankbonner informed the Court that he did not believe Nastri would testify but asked for the weekend so that Nastri could fully consider his decision. (*Id.* at 253.) The Court granted the request, agreeing to let Nastri have additional time over the weekend to reflect on his right to testify. (*Id.* at 254, 263–64.) Several minutes later, however, after Nastri conferred with his attorney and engaged in a dialog with the Court regarding his right to testify on his own behalf, (*id.* at 257–61), Nastri announced that he would not testify and stated: "[T]hat's my final decision, your Honor. I understand everything, and I'm not going to testify." (*Id.* at 264). By the time Nastri made this announcement waiving his right to testify, the jury had been dismissed and so the Court did not close the evidence. (*Id.*) Ultimately, when the Court reconvened on Monday, June 2, 2014, Attorney Fankbonner announced that he would not present any evidence, and the defense rested. (Doc. 416 at 33–34.)

After deliberating, the jury returned its verdict, finding Nastri guilty on the sole count of conspiracy, and by special verdict, finding that the conspiracy involved 100 grams or more of heroin. (*Id.* at 139–40.)

## III. Sentencing

A Presentence Report (PSR) was prepared in anticipation of sentencing. The PSR determined that, with respect to the advisory United States Sentencing Guidelines, the adjusted offense level was 39, and Nastri's criminal history category was VI. With regard to the adjusted offense level determination, the PSR concluded that the conspiracy involved the distribution of at least one kilogram but less than three kilograms of heroin, giving rise to a base offense level of 30. (PSR ¶ 84.) Four additional levels were added for Nastri's possession of a firearm pursuant to USSG § 2D1.1(b)(2) and Nastri's commission of the offense conduct as part of a pattern of criminal livelihood under USSG § 2D1.1(b)(14)(E). (PSR ¶ 85.) Nastri also received a three-level managerial role enhancement under USSG § 3B1.1(b), as the evidence revealed that Nastri had directed several individuals to distribute drugs in Maine and Vermont. Finally, the PSR concluded that two additional levels were warranted because Nastri had engaged in obstruction of justice under USSG § 3C1.1 (PSR ¶ 88), by writing letters to his former girlfriend, Laura Urban, as part of an effort to dissuade Urban from testifying. (PSR ¶ 79.) These calculations resulted in an adjusted offense level of 39 under the advisory Guidelines, which carried an advisory imprisonment range of 360 months to life.

On January 30, 2015, Nastri appeared in the Court for sentencing. The Court rejected the PSR's conclusion that Nastri should receive a two-level firearms enhancement, with the effect of lowering the offense level to 37. (Doc. 419 at 41–42.) Further, in light of various mitigating circumstances described by the Court, the Court adjusted the offense level to 32, with the resulting sentencing range of 210 to 262 months' imprisonment. (*Id.* at 45.) The Court then imposed a 210-month term of imprisonment, to be followed by eight years of supervised release. (*Id.* at 46.) Nastri was advised of his right to a direct appeal. (*Id.* at 48.) Judgment was entered against Nastri on February 4, 2015. (Doc. 400.)

## IV.    Nastri's Appeals

On February 11, 2015, Nastri, represented by Attorney Fankbonner, filed a Notice of Appeal. (Doc. 401.) Nastri also filed a *pro se* Notice of Appeal. (Doc. 403.) On appeal, represented by Attorney Jesse Siegel, substitute counsel under the CJA, Nastri raised four claims: (1) that he was deprived of a fair trial when the Court failed to excuse a juror; (2) that the prosecutor made improper and prejudicial remarks during summation; (3) that the Court erred in applying the criminal livelihood enhancement to his offense level calculation under the advisory Guidelines; and, (4) that the definition of a pattern of criminal conduct found in the advisory Guidelines is unconstitutionally vague. *Nastri*, 647 F. App'x at 53–54. The Second Circuit Court of Appeals rejected each of these claims, and affirmed the conviction and sentence. *Id.* at 53–55.

Nastri filed a petition for a writ of certiorari to the Supreme Court, which denied certiorari on October 3, 2016. *Nastri v. United States*, 137 S. Ct. 232 (2016).

## Analysis

### I.  Section 2255 Motion

On September 26, 2017, Nastri filed his Motion under 28 U.S.C. § 2255 to vacate, set aside, or correct the judgment imposed on him.  (Doc. 441.)  Under § 2255(a), "a prisoner in custody" may collaterally attack his sentence on the "ground that [it] was imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255(a).  The statute provides relief only "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotation marks omitted).  In his § 2255 Motion, Nastri claims multiple grounds for relief arising from ineffective assistance of counsel before both the district court and appellate court, as well as cumulative error.  (*See* Doc. 441.)  As the petitioner, Nastri bears the burden of establishing his claims under § 2255 by a preponderance of the evidence.  *See Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000); *Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995).

#### A.  Procedural Default

Under the "procedural default rule," a habeas motion cannot take the place of a direct appeal, and claims not raised on direct appeal are subject to dismissal for procedural default.  *Bousley v. United States*, 523 U.S. 614, 621–22 (1998); *see also United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998).  The rule does not apply to Nastri's IAC claims, however, because IAC claims are an exception to the procedural default rule and may, as here, be raised for the first time in a § 2255 motion.  *Massaro*

*v. United States*, 538 U.S. 500, 509 (2003); *see also Yick Man Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010). Similarly, Nastri's cumulative error claim is not procedurally defaulted, though it was not raised on direct appeal, because it consists of his IAC claims. *See McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 72 n.1 (2d Cir. 2011) (noting that cumulative error claims are procedurally barred where their component claims are procedurally barred).

## B.    Standards Governing IAC Claims

In criminal proceedings, a defendant has a Sixth Amendment right to effective assistance from his attorney at all stages of the proceedings. The attorney has an "overarching duty to advocate the defendant's cause." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

IAC claims are governed by the Supreme Court's holding in *Strickland v. Washington*. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). In *Strickland*, the Court established a two-prong test to determine whether a petitioner's Sixth Amendment right to effective assistance of counsel has been violated. First, under the "performance" prong, a petitioner must show that trial counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms." *Strickland*, 466 U.S. at 688. Second, under *Strickland's* "prejudice" prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding"; rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

at 693–94; *see Lynn v. Bliden*, 443 F.3d 238, 248 (2d Cir. 2006).  Additionally, the

Second Circuit "requires some objective evidence other than defendant's assertions to

establish prejudice." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (citing

*United States v. Gordon*, 156 F.3d 376,

380–81 (2d Cir. 1998) (per curiam)).  In considering IAC claims, lower courts may

consider either prong of the *Strickland* test first.  *Greiner v. Wells*, 417 F.3d 305, 319

(2d Cir. 2005) ("'[T]here is no reason for a court deciding an [IAC] claim . . . to address

both components of the inquiry if the defendant makes an insufficient showing on one.'"

(alterations in original) (quoting *Strickland*, 466 U.S. at 697)).

Regarding the first prong of the *Strickland* analysis, the question is not whether

counsel "deviated from best practices or most common custom," but whether his

representation "amounted to incompetence under 'prevailing professional norms.'"

*Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

"Constitutionally effective counsel embraces a 'wide range of professionally competent

assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and

made all significant decisions in the exercise of reasonable professional judgment.'"

*Greiner*, 417 F.3d at 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690).  In

assessing the attorney's performance, a court "must apply a 'heavy measure of

deference to counsel's judgments,'" *id.* (quoting *Strickland*, 466 U.S. at 691), and

recognize a "strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance." *Palacios v. Burge*, 589 F.3d 556, 561 (2d Cir. 2009)

(internal quotation marks omitted).  "A lawyer's decision not to pursue a defense does

not constitute deficient performance if, as is usually the case, the lawyer has a reasonable justification for the decision." *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* at 588 (quoting *Strickland*, 466 U.S. at 690). "However, 'strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91).

Nastri bears the burden of proving his IAC claims by a preponderance of the evidence. *See United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004) ("The burden of establishing both constitutionally deficient performance and prejudice is on the defendant."); *see also Triana*, 205 F.3d at 40–42 (petitioner failed to demonstrate a divergence between his interests and those of his attorney on any factual matter, legal issue, or course of action). Self-serving, conclusory allegations are insufficient to establish ineffective assistance of counsel. *See United States v. Torres*, 129 F.3d 710, 715–17 (2d Cir. 1997).

## C.    Analysis of Nastri's IAC Claims

Nastri's allegations of ineffective assistance of counsel at trial and on appeal include ineffective representation during the plea bargain negotiations, failure to object to the admission of prison telephone calls, failure to seek suppression of certain cellular telephone location data, failure to prepare Nastri to testify, failure of appellate counsel to challenge the admission at trial of the letters written by Nastri to Urban, and

cumulative error.  (*See* Doc. 441 at 3–16.)  As explained below, none of Nastri's

arguments satisfy the demanding standards of *Strickland*.

### 1.    Alleged Ineffective Representation During Plea Negotiations

Nastri admits that Attorney Fankbonner advised him of the government's plea

offer that contemplated the imposition of a sentence of five to thirteen years'

imprisonment, and that he was "very seriously thinking about taking the plea" but

wanted to see the evidence against him.  (Doc. 441-1 at 1, ¶ 2.)  He alleges that

Fankbonner only advised him of the government's witnesses and, because they were all

drug addicts, Nastri believed he had a chance to win at trial.  (*Id.*)  At trial, however,

Nastri notes that the government introduced "very incriminating" evidence, of which he

claims he was not aware.  (*Id.* ¶ 3.)  He now contends that, had he known of this

evidence, he "would have taken the government's plea bargain instead of proceeding to

trial."  (*Id.*)

Nastri does not assert that his lawyer failed to convey a plea offers to him.  He

acknowledges that Attorney Fankbonner conveyed the government's offers, but now

asserts that Fankbonner failed to review the full quantum of evidence with him to

permit him to make an informed decision with respect to that offer.  When a defendant

who chooses to proceed to trial over taking a plea offer later challenges that choice on

the grounds of ineffective assistance of counsel, he must establish the following:

> [T]hat but for the ineffective advice of counsel there is a reasonable
> probability that the plea offer would have been presented to the court (*i.e.*,
> that the defendant would have accepted the plea and the prosecution would
> not have withdrawn it in light of intervening circumstances), that the court
> would have accepted its terms, and that the conviction or sentence, or both,

under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 566 U.S. 156, 164 (2012). Nastri has not shown a reasonably probability that he would have accepted the plea.

Nastri's allegations are at odds with Attorney Fankbonner's Affidavits, which I conclude are credible. In Fankbonner's recollection, from his first telephone contact with his client, Nastri indicated that he "had no interest in accepting the plea deal" conveyed by the government. (Doc. 445 at 1, ¶ 3.) When Fankbonner and Nastri met in person prior to the pretrial conference, Fankbonner explained to Nastri that he expected the government to call numerous coconspirators to testify and that there would be other evidence beyond coconspirator testimony,

> including photographs of Mr. Nastri and his co[]conspirators . . . , photographs of the narcotics and cash recovered from [Nastri] and his co[]conspirators, call logs, text messages, and other material culled from the conspirators' cell[] phones, and other evidence of the organization's activities throughout New England during the time of the conspiracy.

(*Id.* at 2, ¶ 11.) As the case proceeded through trial, Fankbonner continued to discuss the possibility of a plea with Nastri. (Doc. 446 at 2, ¶ 9.) Nastri indicated to Fankbonner that he would not enter a plea agreement calling for him to testify at trial in other cases, and that he wanted to take his chances at trial because it was likely his father would die while he was incarcerated. (*Id.* ¶¶ 10, 12.) Nastri made this decision with knowledge of his sentencing exposure if convicted at trial. *See id.* According to Attorney Fankbonner, during the trial, Nastri "expressed his surprise at the thoroughness and grace with which the government presented the evidence against

him, but not at the evidence itself," as they had reviewed it prior to the trial.  (Doc. 445 at 5, ¶ 39.)

Accordingly, Nastri's contention that his counsel did not review the evidence with him before trial is directly contradicted by Attorney Fankbonner's Affidavit.  Even though Nastri points to the returned discovery package and Fankbonner's uncertainty regarding whether the second package contained CDs, (*see* Doc. 450 at 1–2), Nastri met with Fankbonner in person just before the April 28, 2014 pretrial conference and they reviewed the entirety of the discovery material.  (Doc. 445 at 2, ¶¶ 8–9; Doc. 446 at 2, ¶¶ 8–9.)  The government's April 18, 2014 discovery letter to Fankbonner references the jail calls "produced to [counsel]," and lists six calls that it "specifically plans to introduce [at trial]."  (Doc. 447-1 at 4.)  In May, prior to trial, Fankbonner sought to have Nastri moved to a prison that permitted Nastri access to electronic evidence.  (Doc. 317 at 1–2.) That request was denied as moot as Nastri had already been moved to such a facility. (Doc. 319.)

More importantly, the trial transcript reveals that on the first day of trial, the government offered for admission written evidentiary stipulations signed by Nastri, in which Nastri agreed to the admission of his telephone calls made at both a Rhode Island prison facility and a New York prison facility.  (Doc. 412 at 64–67; *see* Doc. 352 at 14.)  Nastri's execution of these stipulations prior to trial is compelling evidence that his attorney had reviewed the relevant evidence with him prior to trial.

Against this backdrop, Nastri's naked assertion that Attorney Fankbonner failed to review discovery with him is insufficient to satisfy Nastri's burden of proof.  *See*

*United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987) ("Airy generalities [and] conclusory assertions . . . will not suffice" to establish a genuine issue of fact.). Nastri has failed to meet his burden to show that, but for the ineffective advice of his trial counsel, there is a reasonable probability that he would have accepted the plea offer. Accordingly, Nastri's first IAC claim is meritless.

## 2. Failure to Object to Jailhouse Recordings

Nastri next argues that Attorney Fankbonner was ineffective because he did not object to the admission of jailhouse recordings and did not require the government to lay a proper foundation for their admission. He seeks a new trial with the recordings excluded. (Doc. 441 at 7–9.)

In response, Fankbonner accurately points out that, at the trial, Nastri "stipulated with the government as to the authenticity of [the] recordings of Mr. Nastri's jailhouse phone calls, as there was no serious doubt as to their authenticity or as to the fact that the statements contained therein were made voluntarily." (Doc. 445 at 5, ¶ 38; *see also* Doc. 412 at 64–66.) The Second Circuit has held that decisions like this, i.e., regarding whether to stipulate to certain evidence at trial, "are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (internal quotation marks omitted). Because Nastri has failed to show "exceptional grounds" for challenging the decision to stipulate to the recordings, the claim fails.

### 3.     Failure to Seek Suppression of Cell Data

Nastri next challenges Attorney Fankbonner's failure to move to suppress historical cell-site data.  He argues that the information was procured without a warrant and was used to convict him in violation of his Fourth Amendment rights.  He seeks a new trial without the cell-site information.  (Doc. 441 at 9–11.)

The government responds by pointing to an April 17, 2014 application for a search warrant, with a corresponding warrant issued on the same day, for authorization to obtain historical cell-tower data concerning several specific cellular telephone numbers, including a cellular number established through trial testimony as belonging to Nastri.  (Doc. 447 at 16 (citing Docs. 301, 303, 413 at 150).)  Fankbonner cannot be faulted for failing to move to suppress the historical cell-site information that was the subject of that warrant under a faulty warrantless search theory.  Again, Nastri has failed to show that Fankbonner was ineffective in this respect, and the claim fails.

### 4.     Failure to Prepare Nastri to Testify at Trial

Nastri alleges that Attorney Fankbonner neglected his duty to prepare Nastri to testify at the trial, and as a result, he was effectively unable to testify in his own defense.  (Doc. 441 at 14–15.)

In his Affidavit, however, Fankbonner states that he did not prepare Nastri to testify because Nastri accepted his advice not to testify.  (Doc. 445 at 3, ¶¶ 16, 18.)  This was clearly sound advice.  Had Nastri testified, he would have been subject to impeachment with his four prior drug felony convictions, as the Court had ruled prior to trial that impeachment by prior conviction was permissible under Federal Rule of

Evidence 609. (Doc. 333 at 8.) In addition, Nastri would have been confronted again with his incriminating text messages and the damaging admissions that he made in his prison telephone calls and his written letters.

On Friday, May 30, 2014, following the government's presentation of the evidence at trial, Attorney Fankbonner advised the Court that he did not believe Nastri would testify but asked the Court if they could have "until Monday morning" to make a final decision. (Doc. 415 at 253.) The Court was willing to grant the request, stating that he "appreciate[d] the fact that [Nastri] should have an opportunity to think about his right to testify." (*Id.* at 254.) However, after conferring with Fankbonner and engaging in a dialog with the Court regarding his right to testify on his own behalf, (*id.* at 254–61), Nastri informed the Court that he "understand[s] everything," had made his "final decision," and stated: "I'm not going to testify." (*Id.* at 264.) Prior to making that decision, Nastri expressed his understanding of the risks involved in testifying, stating to the Court: "[P]art of me wants to testify, but the other part knows . . . that they could bring up my past convictions, and it's go[ing to] make me look . . . ." (*Id.* at 258.) Nastri continued: "I mean, they put on a beautiful case and I feel like I lost already." (*Id.*) The Court then "suggest[ed]" that Nastri "think about it over the weekend," and firmly stated: "You need to think about [it], Mr. Nastri." (*Id.* at 260.) But Nastri insisted that he understood the situation and was "not going to testify." (*Id.* at 264.)

On this record, Nastri's self-serving allegation that he would have testified had Attorney Fankbonner prepared him—which is contradicted by both Fankbonner's affidavit and the transcript of the hearing—does not meet Nastri's burden of proof.

*Torres*, 129 F.3d at 715–17 (self-serving conclusory allegations insufficient to establish IAC). The Court explicitly afforded Nastri the option to take the weekend to decide whether to testify, during which time Nastri and counsel could have prepared for such testimony, but Nastri decided against that option, instead informing the Court that he had made his "final decision" *not* to testify. (Doc. 415 at 264.) In light of his in-court statements—which are presumed to be accurate, *Blackledge v. Allison*, 431 U.S. 63, 74 (U.S. 1977) ("Solemn declarations in open court carry a strong presumption of verity.")—Nastri has failed to meet his burden to show that Attorney Fankbonner's failure to prepare him to testify was clearly incompetent.

### 5.    Alleged Ineffective Representation on Appeal

Nastri also alleges that his appellate counsel's representation of him was ineffective. Specifically, Nastri contests Attorney Jesse Siegel's decision not to argue on appeal that Nastri's letters to his ex-girlfriend, Laura Urban, were inadmissible under Federal Rule of Evidence 404(b). (Doc. 441 at 11–13.) In the letters, Nastri implored Urban not to testify against him and asked her to smuggle drugs into jail for him.

Urban, an indicted coconspirator who had pled guilty pursuant to a cooperation agreement, testified in great detail at the trial. She described the inner workings of the conspiracy, her own addiction to heroin and role in the conspiracy, and Nastri's managerial role in the conspiracy. (Doc. 415 at 122–91.) Urban authenticated letters she had received from Nastri, testifying that she recognized the handwriting to be Nastri's and noting that the signature on some of them was Nastri's. (*Id.* at 125.) In one letter, Nastri, who was incarcerated at the time, wrote in coded terms that there

was a great deal of money to be made by selling drugs in prison. (*Id.* at 125–29.) According to Urban, Nastri—again using coded language—asked her to smuggle drugs into prison for him. (*Id.*) In another letter, Nastri threatened to harm another conspirator, stating: "Just remember, I may be locked up but I got favors to call on for days." (*Id.* at 130.) Several of Nastri's letters were admitted at trial, and their admissibility was the subject of a pretrial motion in limine, discussed below.

Nastri claims Attorney Siegel should have argued the letters were "other crimes evidence" that should not have been admitted at trial under Federal Rule of Evidence 404(b). Rule 404(b) "governs the admissibility of evidence of [a person's] prior or subsequent 'bad acts.'" *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). The rule states, in part: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Although Rule 404(b) "prohibits the admission of such evidence if it 'prove[s] the character of a person' to show his propensity to commit the charged act," it permits admission of that evidence "for other purposes." *Curley*, 639 F.3d at 56 (alteration in original). "Permissible purposes" include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Additionally,

> evidence of uncharged criminal activity is not considered "other crimes" evidence under [Rule] 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.

*United States v. Gonzales*, 110 F.3d 936, 942 (2d Cir. 1997) (second and third alteration in original) (internal quotation marks omitted).

"This Circuit follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *Curley*, 639 F.3d at 56. But even under this approach, "district courts should not presume that such evidence is relevant or admissible." *Id.*

Prior to trial, in an Opinion and Order, the Court granted the government's motion in limine seeking admission of this evidence, engaging in the careful balancing of probative value of the evidence versus its prejudicial impact required by Rule 403. (Doc. 333.) The Court noted the government's argument that the letters were "admissible as to the discussion about co-conspirators because this information is 'intrinsically relevant' to the conspiracy as it demonstrates the nature of the connection between Nastri and Urban, as well as other conspirators mentioned in the letters." (*Id.* at 6.) The Court also found the letters admissible under Rule 404(b) "to prove motive, plan, identity, and intent with respect to the charged conspiracy, as they speak to Nastri's complicity in the scheme and his ongoing intent to sell narcotics while imprisoned." (*Id.* at 7.) With regard to the Rule 403 analysis, the Court found the letters "especially probative," explaining:

> At jury selection, defense counsel indicated that the defense's strategy would focus on the credibility of the cooperating witnesses. This makes letters written by [Nastri] concerning his knowledge of the offense, his relationship with Laura Urban and others in the conspiracy, and his efforts to stop these co-conspirators from cooperating with the Government especially probative.

> By contrast, admission of the evidence would not be unfairly prejudicial as it regards conduct equivalent to the charged offense.

(*Id.*)  Accordingly, the Court found the letters "highly relevant" and allowed their introduction at trial.  (*Id.*)

Given the above law and the Court's well-reasoned explanation regarding why the letters were admissible at trial, Attorney Siegel's decision not to appeal the issue was "reasonabl[y] justif[ied]," *DeLuca*, 77 F.3d at 588 n.3, and did not constitute "incompetence under prevailing professional norms." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted).  The letters sent to Urban had a tendency to make the government's conspiracy theory more probable, and thus they were relevant under Federal Rule of Evidence 401(a).  This relevance was not outweighed by the letters' prejudicial potential, as they alluded to drug-dealing that was no more egregious than that for which Nastri had been indicted.  The Court may not "second-guess" Siegel's "reasonable professional judgment[] and impose on [him] a duty to raise every 'colorable' claim suggested by [his] client." *Jones v. Barnes*, 463 U.S. 745, 754 (1983).

Moreover, even if Nastri could establish that Attorney Siegel's decision not to appeal the admission of the Urban letters was ineffective, Nastri has failed to show that he was prejudiced by that decision, meaning, Nastri has not shown that he would have had a different or better result had Siegel appealed the issue. *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").  Rather, Nastri likely would not have succeeded on the issue had he raised it on appeal.

The Court's admission of the letters would have been reviewed on appeal under the abuse of discretion standard, *Curley*, 639 F.3d at 56 (Rule 404(b) determination); *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) (Rule 403 determination), and subject to harmless error analysis. *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (citing Fed. R. Crim. P. 52(a)). Under this standard, if, viewing the evidence "in the light most favorable to the government," *United States v. Vitale*, 459 F.3d 190, 191 (2d Cir. 2006), the appellate court could "conclude with fair assurance that the evidence did not substantially influence the jury[,]" an erroneous ruling on the admissibility of the letters would be considered harmless. *Mercado*, 573 F.3d at 141.

The government produced a great deal of evidence against Nastri, including text messages, photographs, jailhouse recordings and admissions, and testimony of a number of cooperating conspirators. Specifically, as noted above, trial testimony included the testimony of investigators who described seizing drugs, firearms, and other evidence of drug trafficking from members of the conspiracy during the investigation. (*See* Doc. 412 at 76–79, 97–113; Doc. 413 at 12–78; Doc. 415 at 15–36, 192–205.) Law enforcement witnesses also testified that confidential informants executed several controlled buys from the conspirators. (*See* Doc. 414 at 162–73; *id.* at 246–63.) In addition, three members of the conspiracy who had entered pleas of guilty and who were cooperating with the government testified about Nastri's role in the conspiracy. (*See* Doc. 412 at 113–201; Doc. 413 at 96–236; Doc. 415 at 58–177.) Their testimony was corroborated by cellular telephone records including location monitoring records and transcripts of text messages sent by the conspirators, (*see* Doc. 412 at 263–82;

Doc. 413 at 5–78; Doc. 415 at 6–15), recordings of Nastri's prison telephone calls in which Nastri made damaging admissions, (Doc. 412 at 64–71; Doc. 414 at 37, 161–62, 264; Doc. 415 at 251–52), and letters from Nastri to Urban. (Doc. 415 at 124–34.) Additional corroboration came from a March 14, 2012 stop and search of Nastri's person and vehicle, during which police seized $17,763 in cash, a small quantity of marijuana, drug paraphernalia, and a black ledger book that appeared to reflect drug transactions. (*See* Doc. 413 at 230–34; Doc. 415 at 228–51.) And finally, confiscated currency included a $20 bill that matched pre-marked money from a controlled buy on March 8, 2012. (Doc. 415 at 219.)

In consideration of all this evidence, it is likely that Urban's letters contributed only slightly to the jury's verdict. Thus, even assuming Attorney Siegel's representation of Nastri was deficient (which it was not), Nastri has failed to show that the outcome of his appeal would have been different had Siegel raised the Rule 404(b) claim regarding the Urban letters before the Second Circuit. Accordingly, Nastri's IAC claim regarding his appellate counsel fails.

### 6.    Cumulative Error

Nastri bears the burden of proving the truth of his claims that his trial and appellate counsels' performances were constitutionally deficient. As discussed above, his self-serving assertions are not borne out by either his trial attorney's credible affidavits or the record as a whole. Thus, Nastri's *Strickland* claims must fail, and there is no basis for a cumulative error claim.

## D. Hearing Requirement

In ruling on a § 2255 motion, the Court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see Pham*, 317 F.3d at 185 (stating § 2255 does not permit summary dismissals of motions that present facially valid claims). However, § 2255 does not entitle the prisoner to a hearing where his allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962); *see Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001). To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief. *See Machibroda*, 368 U.S. at 494; *Aiello*, 814 F.2d at 113–14. For the reasons stated above, Nastri has failed to make this showing, and thus no hearing is required.

## II. Request to Appoint Counsel

Finally, Nastri requests that the Court appoint counsel to represent him with respect to the pending § 2255 Motion. (*See* Doc. 441 at 17; Doc. 450 at 6.) Nastri has no right to appointed counsel in these collateral proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."); *Carranza v. United States*, 794 F.3d 237, 242 (2d Cir. 2015) ("[T]he constitutional right to the effective assistance of counsel extends to direct appeal, but not to collateral proceedings." (citation omitted)). Moreover, Nastri has failed to raise in his § 2255 Motion any issues entitling him to relief, and thus it would not be in the interest of justice to provide him counsel. *See*

*United States v. Moses*, No. 1:05-cr-133-jgm, 2014 WL 104012, at *17 (D. Vt. Jan. 9, 2014); *United States v. Doe*, No. 01 CR. 782 (GEL), 2005 WL 167601, at *7 (S.D.N.Y. Jan. 25, 2005) ("The 'interests of justice' do not 'require' further expenditure of public funds for the appointment of counsel to pursue a meritless argument still further."). Therefore, Nastri's request to appoint counsel is DENIED as moot.

## Conclusion

As explained above, because Nastri has not carried his burden to show his sentence was imposed in violation of the Constitution or laws of the United States, I recommend that Nastri's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence (Doc. 441) be DENIED without a hearing. Nastri's request for appointed counsel (Doc. 441 at 17; Doc. 450 at 6) is DENIED as moot.

I further recommend that the Court refrain from issuing a certificate of appealability. In a § 2255 proceeding, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under this standard, a certificate will not issue unless reasonable jurists could debate whether the petition should have been resolved in a different manner, or the issues are "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). I am unable to find that reasonable jurists could debate whether Nastri's Motion should have been resolved in a different manner. Accordingly, Nastri does not satisfy this standard and I recommend that a certificate of appealability be DENIED.

Dated at Burlington, in the District of Vermont, this 21st day of September 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).